FRANK S. HEDIN
ARUN G. RAVINDRAN
**HEDIN LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131-3302
Telephone:  (305) 357-2107
Facsimile:  (305) 200-8801
E-Mail:        fhedin@hedinllp.com
                   aravindran@hedinllp.com

DAVID W. SCOFIELD – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:  (801) 322-2002
Facsimile:  (801) 912-0320
E-Mail:        dws@psplawyers.com

*Counsel for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| KRISTIN PILKINGTON individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br> v. <br><br> GORSUCH, LTD., <br><br> Defendant. | **CLASS ACTION COMPLAINT (JURY TRIAL DEMANDED)** <br><br> Case No. _____ <br> Honorable_____ |

Kristin Pilkington, individually and on behalf of all others similarly situated,

makes the following allegations pursuant to the investigation of her counsel and

based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Defendant Gorsuch, Ltd. ("Gorsuch") rented, sold, and/or otherwise disclosed for compensation detailed information about Plaintiff's purchases of Gorsuch products—including her full name, home address, the fact that she is a Gorsuch customers, and the dollar amount of the products she purchased (collectively "Private Purchase Information")—to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and various other third parties.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By renting, selling, and/or otherwise disclosing for compensation Plaintiff's Private Purchase Information, without providing Plaintiff prior notice of these disclosures, Gorsuch violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37 (the "NISNPIA").

2.      Documented evidence confirms these facts.  For example, Gorsuch, through list broker NextMark, Inc. ("NextMark"), offers to rent to third parties the mailing list titled "Gorsuch Mailing List", which contains the Private Purchase Information of all 345,578 of Defendant's recent U.S. purchasers at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece), as shown in the screenshot

below:

# Gorsuch Mailing List

The Gorsuch catalog has been a favorite of sophisticated mountain resort guests and homeowners for more than 50 years, offering casual apparel and winter sportswear with a finely-crafted, European flair. Affluent customers are repeat buyers of high-end luxury clothing for both men and women. Gorsuch also offers exclusive gifts and furnishings for elegant homes with an alpine cachet.

**[Get Count]**  **[Get Pricing]**  **[Get More Information]**

| SEGMENTS | COUNTS THROUGH 05/03/2024 | |
|---|---|---|
| 345,578 | TOTAL UNIVERSE / BASE RATE | $105.00/M |
| 13,787 | 3 MONTH BUYERS | + $41.00/M |
| 17,928 | 6 MONTH BUYERS | + $31.00/M |
| 35,051 | 12 MONTH BUYERS | + $26.00/M |
| 65,402 | 24 MONTH BUYERS | + $11.00/M |
| | FUNDRAISERS/PUBLISHERS | $70.00/M |
| | FOOD MAILERS | $80.00/M |

| | |
|---|---|
| POPULARITY: | ▪▪▪▪▪ 100 |
| MARKET: | CONSUMER |
| CHANNELS: | 🖼 |
| SOURCE: | CATALOG |
| PRIVACY: | UNKNOWN |
| DMA?: | NO |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 78% FEMALE 5% MALE |

**DESCRIPTION**

The Gorsuch catalog has been a favorite of sophisticated mountain resort guests and homeowners for 50+ years, offering casual apparel and winter sportswear with a finely-crafted, European flair. Affluent customers are repeat buyers of high-end luxury clothing for both men and women. Gorsuch also offers exclusive gifts and furnishings for elegant homes with an alpine cachet.

**Demographic Profile:**

The Gorsuch customer is 40+ in age.

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #72985 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 7,500 NAME MINIMUM ORDER $325.00 MINIMUM PAYMENT
- NET NAME IS ALLOWED($9.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $150.00/F

**SELECTS**

| | |
|---|---|
| $100+ BUYERS | $41.00/M |
| $150+ BUYERS | $51.00/M |
| $200+ BUYERS | $61.00/M |
| $50+ BUYERS | $26.00/M |
| $75+ BUYERS | $36.00/M |
| 12 MONTH HOTLINE | $26.00/M |
| 24 MONTH HOTLINE | $11.00/M |
| 3 MONTH HOTLINE | $41.00/M |
| 6 MONTH HOTLINE | $31.00/M |
| < $50 BUYERS | $6.00/M |
| CANCELLATION RUNNING CHARGES | $10.00/M |
| GENDER/SEX | $9.00/M |
| SCF | $8.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

**ADDRESSING**

| | |
|---|---|
| KEY CODING | $3.00/M |
| DELIVERY FEE | $75.00/F |

**RELATED LISTS**

- WILAND CATALOG/ONLINE BUYERS DATABASE
- PERUVIAN CONNECTION
- WRAP LONDON
- WRAP/POETRY MASTERFILE
- FRONTGATE
- VIVATERRA (VIVA TERRA)
- POETRY
- METROPOLITAN MUSEUM OF ART
- STORE CHILDREN'S PRODUCT BUYERS (FORMERLY METKIDS)
- SMITHSONIAN CATALOG
- PLOW & HEARTH

**[Get Count]**  **[Get Pricing]**  **[Get More Information]**

3

*See* **Exhibit A** hereto.

3.     By renting, selling, or otherwise disclosing for compensation the Private Purchase Information of its customers to third parties, without providing its customers prior notice of such practices, Gorsuch violated the NISNPIA.  Subsection 2 of the NISNPIA provides:

> A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with [the provisions requiring that prior notice of such disclosures be provided to the consumer, as set forth in] Section 13-37-201.

Utah Code Ann. § 13-37-202(1).

4.     Accordingly, Plaintiff brings this Class Action Complaint against Gorsuch for its intentional, systematic, and unlawful conduct in violation of the NISNPIA.

## <u>NATURE OF THE CASE</u>

5.     To supplement its revenues, Gorsuch rents, sells and otherwise discloses for compensation all of its customers' Private Purchase Information (including their full names, home addresses, the fact that they are Gorsuch customers, and the dollar amount of the products they purchased)—as well as other categories of individualized data and demographic information such as gender—to data aggregators, data appenders, data cooperatives, and other third parties without providing prior notice to (let alone obtaining the consent of) its customers.

6.      Gorsuch's disclosures of Private Purchase Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particular members of society.  For example, anyone could purchase from Gorsuch a list containing the names and addresses of all women in a certain zip code who purchased more than $200 worth of products from Gorsuch. Such a list is available for sale for approximately $183.00 per thousand customers listed.

7.      While Gorsuch profits handsomely from the unauthorized rentals, sales, and other compensation-driven disclosures of its customers' Private Purchase Information, it does so at the expense of its customers' statutory privacy rights (afforded by the NISNPIA) because Gorsuch does not provide any notice of such disclosures to its customers (much less obtain their consent) prior to disclosing their Private Purchase Information to third parties for compensation.

## **PARTIES**

8.      Plaintiff Pilkington is a natural person and a citizen and resident of Salt Lake City, Utah.

9.      On or after January 1, 2004, including on or about January 2, 2024, Plaintiff Pilkington purchased consumer products from Gorsuch on its website, www.Gorsuch.com.  Plaintiff Pilkington initiated her order from within Utah and Gorsuch shipped the goods purchased by Plaintiff Pilkington to her home address in

Utah.

10.     Prior to and at the time Plaintiff Pilkington made her purchases, Gorsuch did not notify Plaintiff Pilkington that it discloses the Private Purchase Information of its customers, and Plaintiff Pilkington has never authorized Gorsuch to do so.  Furthermore, Plaintiff Pilkington was never provided any written notice that Gorsuch rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.

11.     After completing these sales to Plaintiff Pilkington, and during the applicable statutory period, Gorsuch sold, rented, or otherwise disclosed for compensation, without providing Plaintiff Pilkington the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff Pilkington's Private Purchase Information to data aggregators, data appenders, data cooperatives, list brokers, aggressive advertisers, direct-marketing companies, political organizations, non-profit companies, and other third parties.

12.     Defendant Gorsuch, Ltd. is a Colorado corporation that maintains its headquarters and principal place of business in Vail, Colorado.  Gorsuch has at least one office or other place of business in Utah, including but not limited to 333 Main Street, Park City, Utah 84060 and 355 Main Street, Park City, Utah 84060. Gorsuch does business throughout Utah and the entire United States.

13.     Gorsuch is a specialty retailer that sells winter sportswear, resort wear,

and home accessories to consumers.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Gorsuch.

15.    The Court has personal jurisdiction over Gorsuch because Plaintiff's claims arose in substantial part from actions and omissions in Utah, including from Plaintiff's purchases of Defendant's products while Plaintiff resided in Utah, Gorsuch's direction of such products into Utah, and Gorsuch's failure to provide to Plaintiff, in Utah, the notice required by Utah Code Ann. § 13-37-201 before disclosing her Private Purchase Information, including her residential address in Utah, to other persons, the effects of which were felt from within Utah by a citizen and resident of Utah.  Personal jurisdiction also exists over Gorsuch in Utah because Gorsuch is registered to do business in Utah, maintains a place of business in Utah, and conducts substantial business within Utah, such that Gorsuch has significant, continuous, and pervasive contacts with Utah.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, Gorsuch does substantial business in this

judicial District, Gorsuch is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### Utah's Notice of Intent to Sell Nonpublic Personal Information Act

17.     Pursuant to the NISNPIA, "[a] commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

18.      A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

19.     "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i).

20.     "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing

8

patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv).

21.    A commercial entity "is considered to have obtained information as a result of a consumer transaction if . . . the person provides the information to the commercial entity . . . at any time during the consumer transaction . . . and at the request of the commercial entity," or if "the commercial entity otherwise obtains the information . . . and but for the consumer transactions, the commercial entity would not obtain the information." *Id.* § 13-37-201(1)(b).

22.    Section 13-37-201 of the NISNPIA requires a commercial entity to provide the consumer with a notice, in the form set forth in that section, if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . . , the commercial entity obtains nonpublic personal information concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real

9

property; or (iii) other thing of value"])." *Id.* § 13-37-201(1)(a); § 13-37-201(5).

23.     The notice required by section 13-37-201 of the NISNPIA "shall read substantially as follows: 'We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." )." *Id.* § 13-37-201(3)(a).   The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b).   In either case, the notice "shall be sufficiently conspicuous so that a reasonable person would perceive the notice before providing the nonpublic personal information."   *Id.* § 13-37-201(3)(c). The notice "shall be given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[] or . . . the commercial entity otherwise obtains the nonpubllic personal information as a result of the consumer transaction[.]" *Id.* § 13-37-201(2).

24.     The NISNPIA entitles consumers who suffer violations of the statute to recover, *inter alia*, "$500 for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action." *Id.* § 13-37-203.

25.     Despite the fact Gorsuch has completed hundreds of thousands of sales of its products in Utah, Gorsuch disregarded its legal responsibilities to its customers by systematically disclosing their Private Purchase Information to third parties for

compensation, in clear violation of the NISNPIA.

### The Private Information Market:
### Consumers' Private Information Has Real Value

26.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

27.     More than two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

28.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for

---

[1]     **Exhibit B**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last visited July 30, 2021).

[2]     *See* **Exhibit C**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

analysis—and profit.[3]

29.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

30.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

31.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of

---

[3]    **Exhibit D**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

[4]    *See* **Exhibit E**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[5]    **Exhibit F**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

information about consumers that are now available."[6]

32.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

33.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[8]

34.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and

---

[6]      **Exhibit G**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[7]      *See* **Exhibit H**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[8]      *Id.*

inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Gorsuch share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

35.     Information disclosures like those made by Gorsuch are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to

---

[9]     *See* **Exhibit I**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[10]     **Exhibit J**, Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[11]     *Id.*

spend on seemingly attractive offers."[12] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

36.     Thus, information disclosures like Gorsuch's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

37.     Gorsuch is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the consumer-products industries.

38.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[12]     **Exhibit K**, *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

[13]     *See id.*

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

39.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

40.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

41.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

42.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell

---

[14]     *See* **Exhibit L**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wpcontent/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[15]     *Id.*

their information themselves.[16]

43.    These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[17]

44.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]

### Gorsuch Unlawfully Rents, Sells, and Otherwise Discloses for Compensation Its Customers' Private Purchase Information

45.    Gorsuch maintains a vast digital database comprised of its customers'

---

[16]    *See* **Exhibit M**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[17]    *See* **Exhibit N**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[18]    *See* **Exhibit O**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

Private Purchase Information.

46.     Gorsuch discloses for compensation its customers' Private Purchase Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Gorsuch customer, including his or her gender.  (*See, e.g.*, **Exhibit A**).  The "enhanced" customer lists that Gorsuch receives back from the data aggregators and data appenders are more valuable to Gorsuch than its original customer lists, and can be sold or rented by Gorsuch to other third parties for more money than its original customer lists. In this way, Gorsuch increases its profits gained from its sales and rentals of its customer lists.

47.     Gorsuch also discloses for compensation its customers' Private Purchase Information to data cooperatives, who in turn disclose or otherwise make available to Gorsuch their own customer list databases. These third-party customer list databases contain information that is valuable to Gorsuch, as they enable Gorsuch to identify prospective customers (i.e., "prospects") to whom it can send advertisements and other offers to sell its tangible and/or intangible property, and with whom it can ultimately enter into consumer transactions with and generate revenue from.

48.     Additionally, Gorsuch sells, rents, and/or otherwise discloses for compensation its customer lists—which include all of its customers' Private

Purchase Information, identifying which individuals purchased Gorsuch's products, and the dollar amount of their purchases, and can include the sensitive information (such as gender) obtained from data aggregators and appenders—to numerous other third parties, including other consumer-facing companies, aggressive direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes. (*See* **Exhibit A**).

49.     As a result of Gorsuch's data compiling and sharing practices, companies can purchase, rent, or otherwise obtain for compensation customer lists from Gorsuch that identify Gorsuch's customers by their most intimate details, including the fact that they purchased Gorsuch products, and the dollar amount of their purchases, as well as their gender.  Gorsuch's disclosure of such sensitive and private information, to any member of the public interested in purchasing it, is invasive of its customers' (including Plaintiff's and Class members) privacy and intrusive upon their private affairs and concerns in a way that the average person would find highly offensive.  Gorsuch's disclosures also put its customers at risk of serious harm from scammers.

50.     Gorsuch fails to provide prior notice of these disclosures to its customers as required by Utah Code Ann. 13-37-201, let alone obtain its customers' consent prior to making such disclosures, and its customers remain unaware that their Private Purchase Information and other sensitive information is being rented,

sold, and otherwise disclosed for compensation on the open market.

51.     Since January 1, 2004, Gorsuch has offered its products for sale through various sales channels, including in its catalogs and on its website. Regardless whether a consumer purchased Gorsuch's products over the Internet, by telephone, or through traditional mail, since January 1, 2004 Gorsuch has not required the consumer to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy before making their purchase.  Consequently, Gorsuch has uniformly failed to provide the notice required by Utah Code Ann. 13-37-201 to – much less obtained any form of consent from – any of its customers before they made purchases on Gorsuch's website or by mail or phone (or before it disclosed their Private Purchase Information to third parties for compensation).

52.     Thus, during the applicable statutory period, Gorsuch disclosed all of its customers' Private Purchase Information for compensation, to various third parties, without providing advance notice of these practices to its customers.

53.     By and through these actions, Gorsuch has disclosed to third parties its customers' Private Purchase Information for compensation in direct violation of the NISNPIA.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff seeks to represent a class defined as all persons in Utah who had their Private Purchase Information obtained by Gorsuch on or after January 1,

2004 as a result of a consumer transaction and who, at any point during the applicable statutory period, had such Private Purchase Information disclosed by Gorsuch to one or more third party (the "Class").  Excluded from the Class is any entity in which Gorsuch has a controlling interest, officers or directors of Gorsuch, and any person whose only consumer transaction(s) with Gorsuch since January 1, 2004 occurred at one or more of Gorsuch's retail brick-and-mortar stores.

55.    Members of the Class are so numerous that their individual joinder herein is impracticable.  The members of the Class number in at least the thousands. The precise number of Class members and their identities is unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Gorsuch.

56.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Gorsuch is a "commercial entity" within the meaning of the NISNPIA; (b) whether Gorsuch provided the notice required by the NISNPIA to Plaintiff and the Class members before they entered into consumer transactions with Gorsuch; (c) whether Gorsuch obtained Plaintiff's and Class members' Private Purchase Information as a result of consumer transactions, and whether such information constitutes "nonpublic

personal information" within the meaning of the NISNPIA; (d) whether Gorsuch disclosed Plaintiff's and Class members' Private Purchase Information to a third party for compensation; and (e) whether Gorsuch's disclosures of Plaintiff's and the Class's Private Purchase Information to third parties violated the NISNPIA.

57.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the NISNPIA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Gorsuch's uniform wrongful conduct in intentionally disclosing their Private Purchase Information to third parties for compensation.

58.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

59.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Gorsuch's liability.  Individualized litigation increases the delay and expense to all parties and

multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Gorsuch's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of Utah's Notice of Intent to Sell**
**Nonpublic Personal Information Act**
**(Utah Code Ann. § 13-37)**

60.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

61.   Plaintiff brings this claim individually and on behalf of the members of the Class against Gorsuch.

62.   Gorsuch maintains a place of business in Utah, and in the ordinary course of business enters into transactions with consumers in Utah.  Accordingly, Gorsuch is a "commercial entity" within the meaning of the NISNPIA.  *See* Utah Code Ann. § 13-37-102(2)(a).

63.   On or after January 1, 2004, Plaintiff purchased consumer products, constituting "tangible" or "intangible" property, from Gorsuch on its Gorsuch.com website.

64.     Each of Gorsuch's sales of tangible and/or intangible property to Plaintiff (and each of the Class members) was initiated and/or completed in Utah, where at all relevant times from where Plaintiff (and the members of the Class) placed and received their orders of the tangible and/or intangible property that they had purchased.   Accordingly, Gorsuch entered into one or more "consumer transaction" with each of Plaintiff and the Class members within the meaning of the NISNPIA. *See id.* § 13-37-102(4)(a)(i).

65.     As a result of such consumer transactions, Gorsuch obtained information pertaining to Plaintiff and Class members that Plaintiff and the Class members provided at Gorsuch's request, and which Gorsuch would not otherwise have obtained but for entering into such consumer transactions with Plaintiff and the Class members. *See id.* § 13-37-201(1)(b). This information, referred to herein as Plaintiff's and Class members' Private Purchase Information, included Plaintiff's and Class members' "purchasing habits" and "personal preferences" within the meaning of the NISNPIA.

66.     At various times during the applicable statutory period, Gorsuch intentionally disclosed Plaintiff's Private Purchase Information, which identified them as purchasers of Gorsuch's products, to various third parties for compensation.

67.     Gorsuch disclosed customer lists containing the Private Purchase Information of all of its customers, including that of Plaintiff and the Class members,

to data aggregators and data appenders, who then supplemented the customer lists with additional sensitive information from their own databases, before sending the customer lists back to Gorsuch. The "enhanced" customer lists that Gorsuch received back from the data aggregators and data appenders were more valuable to Gorsuch than its original customer lists, because the lists that were "enhanced" with the additional information about each customer could be sold or rented by Gorsuch to third parties for more money. In this way, Gorsuch was able to increase its profits gained from its sales, rentals, and other compensation-driven disclosures of its customer lists.

68.     Gorsuch also rented, sold, and/or otherwise disclosed for compensation its customer lists containing Plaintiff's and the Class members' Private Purchase Information—including lists enhanced with the additional personal information from data aggregators and appenders—to innumerable other third parties, including other consumer-facing companies, aggressive direct-mail advertisers, organizations soliciting monetary contributions, volunteer work, and votes, and others.

69.     Gorsuch made each disclosure of Plaintiff's Private Purchase Information, to each of the entities described in the preceding paragraphs, for compensation – namely, money.

70.     The Private Purchase Information Gorsuch disclosed indicates Plaintiff's and the Class members' names and addresses, as well as the fact that they

purchased Gorsuch's products, and the dollar amounts of their purchases, which was information not otherwise in the public domain. *See id.* § 13-37-102(5). Because the records or information disclosed by Gorsuch reveal Plaintiff's and the Class members' "purchasing patterns" and "personal preferences," and "identif[y] [Plaintiff and the Class members] in distinction from other persons," the records or information Gorsuch disclosed to third parties constitute "nonpublic personal information" within the meaning of the NISNPIA. *See id.* § 13-37-102(5).

71.    At no time before entering into a consumer transaction with Gorsuch or providing Gorsuch with her Private Purchase Information did Plaintiff or any member of the Class receive the notice required by Utah Code Ann. § 13-37-201. Specifically, prior to entering into consumer transactions with Plaintiff and the members of the Class and obtaining Plaintiff's and Class members' Private Purchase Information, Gorsuch uniformly failed to provide Plaintiff and the members of the Class with a clear and conspicuous notice in dark bold writing (or orally), such that a reasonable person would perceive the notice, stating that "[w]e may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a).

72.    Plaintiff and the members of the Class never otherwise consented to Gorsuch disclosing their Private Purchase Information to anyone.

73.    Gorsuch's undisclosed, nonconsensual disclosures of all of its

customers' Private Purchase Information intruded substantially upon the solitude and seclusion (including the personal affairs and concerns) of Plaintiff and each of the Class members, in a way that was highly offensive to Plaintiff and would be highly offensive to a reasonable person, including members of the Class.

74.    Gorsuch's disclosures of Plaintiff's and the Class members' Private Purchase Information were not made to third parties in "relat[ion] to the third part[ies] providing to [Gorsuch] . . . services, including business outsource services[,] personal or real property[,] or other thing[s] of value," and the "compensation received by [Gorsuch] as part of the transaction[s] [with third parties] [was not] received by [Gorsuch] for or in consideration of" such "third part[ies] providing to [Gorsuch] [such] services, . . . personal or real property[,] or other thing[s] of value." *Id.* § 13-37-201(5).

75.    Gorsuch is not "subject to a federal law or regulation that governs the disclosure of nonpublic information to a third party," nor is Gorsuch "a covered entity as defined in 45 C.F.R. Parts 160 and 164." *See* Utah Code Ann. § 13-37-201(4).

76.    By disclosing Plaintiff's and the Class members' Private Purchase Information to third parties for compensation, without having provided prior notice to Plaintiff or the Class members as required by Utah Code Ann. § 13-37-201, Gorsuch violated Plaintiff's and Class members' statutorily protected right to

privacy in their nonpublic personal information pertaining to their consumer transactions, as afforded by the NISNPIA. *See id.* § 13-37-202(1) ("A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201.").

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Gorsuch as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order declaring that Gorsuch's conduct as described herein violated Utah's Notice of Intent to Sell Non-Public Information Act;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For an award of $500.00 to Plaintiff and each Class member, as provided by the NISNPIA, Utah Code Ann. § 13-37-203(2)(a);

E.    For prejudgment interest on all amounts awarded; and

F.    For an order awarding reasonable attorneys' fees and costs to counsel for Plaintiff and the Class pursuant to Rule 23 and Utah Code Ann. § 13-37-203(2)(b).

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: June 14, 2024                    Respectfully submitted,

PETERS | SCOFIELD
*A Professional Corporation*


/s/ David W. Scofield
DAVID W. SCOFIELD

       -and-

**HEDIN LLP**
FRANK S. HEDIN*
ARUN G. RAVINDRAN*

* *Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiff and Putative Class*