# Exhibit K

**Prepared Statement of**
**The Federal Trade Commission on**

**"Fraud Against Seniors"**

*Before the*

**Special Committee on Aging**
**United States Senate**
**Indianapolis, Indiana**

**August 10, 2000**

---

I am Rolando Berrelez, Assistant Regional Director of the Midwest Region of the Federal Trade Commission. I am pleased to appear before you today to present information about the Commission's activities with regard to fraudulent marketing practices, especially those that affect the elderly.[1] The Federal Trade Commission is the primary federal consumer protection agency, with wide-ranging responsibilities over nearly all segments of the economy. In pursuing its mandate of protecting consumers, the Commission enforces the Federal Trade Commission Act,[2] which broadly prohibits unfair or deceptive acts and practices, and also enforces more than twenty-five other consumer protection statutes[3] and thirty regulations[4] that address such matters as consumer credit, telemarketing, and the sale of funeral goods and services. Combating fraud has been a top priority in fulfilling that mandate for over a decade. In particular, the Commission has committed significant resources to the war against telemarketing fraud -- a type of fraud that frequently victimizes the elderly.

Fraudulent marketing schemes change over time, but they share one thing in common: they all involve the use of deceptive or unfair practices to separate consumers from their money. Many fraudulent operations use the telephone as the primary means of communicating with their victims. Estimates of losses specifically caused by fraudulent telemarketers range from at least $3 billion to as much as $40 billion annually.[5] The Commission's law enforcement experience shows that telemarketing fraud victimizes consumers of all ages, levels of income, and backgrounds. The elderly, however, constitute a disproportionate number of telemarketing victims, and in some scams, 80 percent or more of the victims are 65 or older. The elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers.

Some older Americans seem especially susceptible to fraudulent offers for prize promotions and lottery clubs, charitable solicitations, and investment offers.[6]

Sections 5 and 13(b) of the Federal Trade Commission Act[7] provide the Commission with several important tools to combat various types of marketing fraud. These provisions authorize the Commission to file civil actions by its own attorneys in federal

district court and to seek an immediate halt to illegal activity. The Commission also seeks to obtain restitution for injured consumers, if possible; if not, the Commission seeks disgorgement of defendants' ill-gotten monies to the U.S. Treasury. Where appropriate, the Commission seeks an *ex parte* temporary restraining order, asset freeze and the appointment of a receiver to halt ongoing fraudulent activities and preserve assets for consumer redress. This extraordinary relief results in the immediate cessation of fraudulent telemarketing or other fraudulent schemes. Every year the Commission pursues such law enforcement activities to prevent hundreds of millions of dollars in fraud losses, and in the past three years, has collected over $61 million on judgments for consumer redress or disgorgement to the Treasury.

In 1994, Congress passed the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), giving the Commission additional authority specifically to attack telemarketing fraud. At Congress' direction, the Commission promulgated the Telemarketing Sales Rule, which became effective on December 31, 1995. The Rule defines and prohibits deceptive telemarketing practices and prohibits other abusive telemarketing practices. One very important feature of the Telemarketing Act is that it permits a joint federal-state telemarketing enforcement strategy by enabling state Attorneys General to go into federal court to enforce the Telemarketing Sales Rule, to halt fraudulent schemes through nationwide injunctions against companies or individuals that violate the Rule, and to obtain restitution for injury caused to the residents of their states by the Rule violations. This grant of authority to the states has provided the Commission with an enormous opportunity to coordinate and leverage federal law enforcement resources with the states for maximum effect.

The Commission, working with its counterparts on the state level and its sister federal agencies, has developed a strategy of law enforcement "sweeps," in which multiple, simultaneous actions are filed all across the country against companies and individuals engaged in a particular type of fraud. Concentrating federal and state resources on a particular type of fraud to bring dozens of law enforcement actions at one time not only sends an emphatic warning to others engaged in the same fraud, it also provides a springboard to raise dramatically consumer awareness of that particular type of fraud. Since 1995, the Commission has led 56 cooperative law enforcement efforts focused upon the most prevalent types of fraud, including fraud that targets older consumers. These sweeps comprised a total of over 1,549 federal and state actions, including 365 cases brought by the Commission. I will describe some of these sweeps more specifically, as I discuss common varieties of marketing fraud.

**Deceptive Prize Promotions and Lottery Clubs**

One type of telemarketing fraud in which the victims are disproportionately elderly is the deceptive prize promotion. Typically, the consumer receives a call enthusiastically congratulating him or her on having been selected to receive a valuable award -- often described as thousands in cash, a car, a vacation, or jewelry. However, there is a "catch" that requires the consumer to send payment, often by an overnight courier service, in order to receive the prize. Then, although the consumer sends the payment as instructed,

he or she does not receive the promised valuable prize. If the consumer receives any award at all, it is generally an item of little or no value, such as inexpensive costume jewelry or a travel certificate that requires huge outlays of cash to redeem. Losses per consumer for telemarketed prize promotions generally range from a few hundred dollars to thousands of dollars. In some instances, consumers have lost their entire life savings to such scams. Although prize promotion telemarketers often ask for only a small amount initially, in a process referred to as "reloading," phone crooks request ever increasing amounts from consumers, promising ever more valuable awards. Once marked as receptive to this type of scam, a consumer often is bombarded with similar fraudulent offers from a host of scam artists. Prize and sweepstakes promotions remains one of the top five categories of complaints reported in the FTC's Consumer Sentinel - a multi-agency law enforcement investigative cyber tool.[8] Accordingly, fraudulent prize promotions have been a frequent target of Commission enforcement efforts. Since 1996, the Commission has led sweeps against prize promotions operators that have resulted in 80 enforcement actions against 119 defendants in 26 states.[9]

Prize promotions are not conducted exclusively through the telephone. In many cases, direct mail is used to capture the attention of the consumer. The Commission has taken action against several direct mail prize promoters, and joined other agencies in "Project Mailbox," begun in October 1997. Project Mailbox includes all types of fraudulent direct mail solicitations, but many of the actions targeted prize promotions. Project Mailbox involves the combined efforts of the FTC, the U.S. Postal Service, the Securities and Exchange Commission, and 25 state Attorneys General and local law enforcers, and, thus far, has resulted in a total of approximately 500 law enforcement actions.

**Telefunders or Bogus Charities**

Another type of telemarketing fraud, sometimes referred to as fraudulent "telefunding," targets consumers, often older citizens, willing to donate money to charitable causes.[10] Fraudulent telefunders, often employing prize promotions, either raise money for bogus charities, misrepresent the amount of donations that go to a bona-fide charity, or make other material misrepresentations about how the donor's money will be used. The Commission has brought several actions attacking alleged telefunding fraud and, again, has coordinated with other agencies to lead sweeps in this area.[11] To date, the effort has resulted in ten FTC cases and 86 state enforcement actions. At the Commission's press conference announcing the Operation Missed Giving sweep in November 1998, AARP released the results of a national survey on charitable giving habits of Americans, distributed a new educational video about telephone fundraising fraud, and operated a "reverse boiler-room," - a spin-off of the phone centers used by fraudulent telemarketers - manned by volunteer callers warning consumers that they may be targeted by deceptive charitable fundraisers and providing them with information on how to protect themselves from scams.

**Business Opportunity Fraud**

Many consumers -- particularly recent retirees or workers who have lost their jobs

through corporate downsizing -- are attracted to advertisements touting opportunities for individuals to operate their own small businesses or to work from home. In many cases, these business opportunities involve distributing products or services through vending machines or retail display racks. Calls from would-be entrepreneurs responding to these advertisements are connected to a telemarketer, who glowingly describes the opportunity and the amount of money that can be made by following the company's business plan. To clinch the sale, the telemarketer often provides the consumer with the names and telephone numbers of other people who have purportedly purchased the business opportunity and from whom the consumer can receive a supposedly objective opinion. In fact, these purported purchasers are "singers" -- individuals who are paid by the telemarketer to lie about the success of the business venture. After the consumer pays anywhere from hundreds to tens of thousand of dollars to become a distributor or to receive the business plan, he or she learns that the revenue projections of the telemarketer were highly inflated and that the only people who make money through the business opportunity are the telemarketers themselves.

Every year, the Commission brings numerous cases against purveyors of fraudulent business opportunities. In fact, the Commission's first major coordinated law enforcement initiative against fraud, "Project Telesweep," targeted such operations. Project Telesweep, launched in July 1995, used the combined efforts of the FTC, the U.S. Department of Justice, and several states to bring nearly 100 actions against alleged fraudulent business opportunities. The project was so successful that it served as a template for future telemarketing sweeps. Most recently, the Commission led "Project Bizillions", which was announced in January 2000. That sweep included 36 Commission cases and 33 state and local law enforcement cases.[12]

**Recovery Scams**

"Recovery" scams once plagued older consumers,[13] but this type of scam now appears almost to have vanished, due to aggressive enforcement efforts and tighter regulations.[14] Recovery scams were particularly egregious because they re-victimized consumers who had already fallen prey to one or more earlier scams. In a recovery scam pitch, the fraud operator offered to help the consumer obtain prizes promised in an earlier scam or to recover money lost in an earlier scam. After paying the fee for the recovery, the consumer never again heard from the recovery scammer - no refund, no prize, just the loss of more money. In some cases, the recovery scam operation was run by the very same individuals who previously defrauded the consumer. Losses per consumer victimized by recovery rooms ranged from a few hundred dollars to thousands of dollars.

Since the fall of 1994, the Commission has brought eight cases against recovery scam artists.[15] These enforcement actions, combined with provisions in the Telemarketing Sales Rule tailored specifically to prevent this type of fraud, have led to a dramatic drop in the number of consumer complaints. The Commission's consumer complaint database shows that complaints about recovery scams plunged by 95 percent from their high point in 1995 to their current low level.

**Credit Card Loss Protection**

In yet another telemarketing scam, fraud artists try to get people to buy worthless credit card loss protection and insurance programs. The telemarketers, who prey on elderly and young adults, scare consumers with false stories, telling them that they are liable for more than $50 in unauthorized charges on their credit card accounts; that they need credit card loss protection because computer hackers can access their credit card numbers through the Internet and charge thousands of dollars to your account, and that the telemarketer are from "the security department" and want to activate the protection feature on their credit card. This type of fraud affects senior citizens in particular. The National Consumer's League reported that a recent study of telemarketing fraud showed that 71 percent of the credit card loss protection plan complaints received by the National Fraud Information Center were made by consumers age 50 and older.[16] To address this problem, the Commission, since September 1999, has led sweeps resulting in four Commission cases and seven state cases against this type of fraudulent operation, including a criminal action by Florida law enforcement authorities.

**The Internet**

To date, most of the fraud affecting the elderly has been perpetrated through the telephone. As the elderly begin to use the Internet, fraud operators can be expected to find them through this new channel of communication and commerce. The Internet offers a novel and exciting means for all consumers to purchase both innovative and traditional goods and services faster and at lower prices, to communicate more effectively, and to tap into rich sources of information that were previously difficult to access and that now can be used to make better- informed purchasing decisions. The Internet's promise of substantial consumer benefits is, however, coupled with the potential for fraud and deception. Fraud operators are opportunistic, and therefore they are always among the first to appreciate the potential of a new technology. After buying a computer and modem, scam artists can erect and maintain a Web site for $30 a month or less, and solicit consumers anywhere on the globe. Most Internet fraud has clear antecedents in telemarketing fraud. What is different is the size of the potential market, and the relative ease, low cost, and speed with which a scam can be perpetrated.

The Commission believes it is important to address Internet fraud now, and in a manner that does not discourage legitimate commercial growth by undermining consumer confidence in the Internet as a safe mode of commerce. Toward that end, the Commission has filed more than 140 cases against 406 defendants whose alleged illegal practices involved the Internet. Most of the cases have involved old-fashioned scams dressed up in high-tech garb.[17] For seniors and their families surfing the Web for health information, one area of particular concern are health-related scams; old-fashioned snake oil salesmen also have gone online. To combat this problem, the Commission launched Operation Cure.All in June 1999, an ongoing federal and state law enforcement and consumer education campaign targeting false and unsubstantiated health claims on the Internet - - focusing in particular on claims for serious diseases such as arthritis, cancer, diabetes, heart disease, AIDS and multiple sclerosis.[18] To date, the FTC has filed seven

actions, sent more than 800 advisory letters to Internet companies making questionable health claims, and distributed tips to consumers on how to spot cyber health fraud and on how to find reliable health information online.

In addition to overall Internet-related law enforcement efforts, the Commission has developed comprehensive consumer and business education initiatives, including Surf Days to inform entrepreneurs about online problems and "teaser" pages to warn consumers about specific scams.[19]

**Additional Approaches to Combating Fraud**

**Assisting Criminal Authorities**

The Commission also combats telemarketing fraud by providing substantial resources to enforcement efforts coordinated by criminal authorities. The FTC assigned eight attorneys to the Chattanooga, Tennessee Telemarketing Fraud Task Force in 1995. Chattanooga had become a leading center of fraudulent telemarketing activity, particularly prize promotion scams. The overwhelming majority of the victims of the Chattanooga operations were elderly. The FTC attorneys were cross-designated as Special Assistant U.S. Attorneys and brought criminal actions against telemarketers operating in the area. By the end of 1996, the Chattanooga Task Force had obtained fifty convictions and combined prison sentences against fraudulent telemarketers totaling over 1,695 months and restitution orders in excess of $35 million.[20] Because the defendants targeted vulnerable victims, including the elderly, their prison sentences were enhanced.[21]

The FTC also participated in a cross-border project in Harrisburg, Pennsylvania where staff assisted in an ongoing crackdown on fraudulent telemarketing schemes based in Canada that targeted victims in the U.S. The defendants mainly telemarketed investments. Since 1995, 125 defendants, including 97 Canadian nationals, have been charged criminally, and more than $4 million has been recovered for restitution to U.S. consumers. And in December 1998, FTC staff assisted a criminal prosecution of a recovery room operation. Many of the approximately 850 victims, who paid defendants more than $1.6 million, were elderly. The owner was sentenced to 63 months in jail, the managers were sentenced to jail terms between 21 to 36 months, and the telemarketers were sentenced from 6 months home detention to 21 months in jail.[22]

The Commission assisted in the recent prosecution of perpetrators of investment schemes based in New Hampshire, including the prosecution of a former U.S. Attorney who, in June 2000, was sentenced to 24 months in prison.[23] In one of these cases, the telemarketers convinced victims to switch their existing Individual Retirement Accounts to a worthless wireless cable investment.

In addition, the Commission participated in Operation Senior Sentinel, announced in December 1995, which, with over 400 arrests in 14 states, was the largest criminal crackdown ever on telemarketing fraud and focused specifically on scams targeting older

Americans. Estimates indicate that nearly 80 percent of the victims in the underlying prize promotion and recovery room cases included in Senior Sentinel were older people. The FTC contributed valuable consumer complaint information to Senior Sentinel and also filed five civil cases in federal district court -- four against alleged fraudulent prize promotions and the fifth against an alleged recovery room.

**Consumer Sentinel and the Consumer Response Center**

The Commission realizes that coordination and information sharing are key to effective consumer protection law enforcement. *Consumer Sentinel*, a secure database developed by the FTC and now shared with over 250 law enforcement agencies in the U.S. and Canada, puts this concept to work. Currently containing more than 250,000 entries, the database allows law enforcement from local sheriffs to the FBI to identify companies and individuals engaging in fraud and to stop scams as they emerge. As the Internet makes cross-border transactions more commonplace, we have recognized the importance of global information sharing. Recently, the Commission entered into an agreement with our Australian counterpart, the Australian Competition and Consumer Commission, to share information through Sentinel, and cooperate in law enforcement efforts. The Commission intends to continue to recruit domestic and foreign consumer protection agencies as Sentinel partners, allowing all to use these resources efficiently and in concert.

Much of the complaint data in the Sentinel system comes directly from consumers who contact the agency. Consumers have toll-free access to the FTC's Consumer Response Center through a consumer helpline. Launched in July 1999 with additional funds appropriated by Congress, 1-877-FTC-HELP allows people from anywhere in the United States to call with questions or complaints and speak to trained counselors. Our Web site, www.ftc.gov, provides an online complaint form, and some complaints reach us through postal mail. The FTC now receives more than 10,000 consumer inquiries or complaints each week.

The agency's data collection and analysis function expanded in 1998 when Congress enacted the Identity Theft and Assumption Act. This law empowered the FTC to collect identity theft complaints, and refer them to law enforcement entities for prosecution. In response, we established the Identity Theft Data Clearinghouse, a component of Consumer Sentinel which contains consumer complaints about this rising crime. Calls to the dedicated identity theft hotline (1-877-ID THEFT) now exceed 1,000 a week, marking a steady increase since the hotline was launched in November 1999. Consumers who call this line are connected to counselors who are specially trained in the intricacies of identity theft and the credit laws. These counselors give pertinent information to callers, assisting them to repair the damage inflicted by the identity thieves. The database now contains close to 15,000 entries, and is available to law enforcers through the secure Sentinel site.[24]

**Cooperative Efforts with Older Consumers**

The Commission and other law enforcement agencies have taken advantage of the fact that many older consumers are eager to help combat fraud. In an effort that began several years ago, many older consumers, whose names had found their way onto lists used by fraudulent telemarketers, have agreed to tape record telemarketing calls they receive or to turn over their old telephone numbers so that undercover investigators can tape the telemarketers' pitches. When a law enforcement agency receives a tape of a telemarketing sales pitch, the agency notes that a tape of the encounter is available and shares that information with other law enforcers through a program known as the National Tape Library. The Commission and other law enforcement agencies have used these tapes effectively in law enforcement actions because they are often incriminating and capture precisely the misrepresentations made by the telemarketer. Through the Commission's Consumer Sentinel database, the index of the National Tape Library is now accessible by means of the Internet to authorized law enforcement agencies, making it significantly easier for consumer protection agencies to learn of and share this incredibly valuable evidence.

In a similar effort to enlist older consumers in the fight against fraud, the Commission has joined with other law enforcers and AARP to form a public/private strike force to collect and review direct mail for future law enforcement purposes. Volunteers have agreed to send suspicious or fraudulent direct mail offers to AARP, where information about the offers will be entered into a database shared with law enforcement authorities.

**Consumer Education**

Consumer education is an effective protection against fraud. To leverage expertise and limited resources, the FTC has developed the Partnership for Consumer Education, a group of over 90 corporations, trade groups, consumer organizations, and federal agencies that works with us to distribute effective consumer education materials to fight fraud. With the assistance of our partners, the Commission has arranged for messages about fraud to appear in such diverse locations as sales catalogs, billing statements, classified advertising, and even on public transit buses.

It is especially important for older consumers to know their rights and learn how to assert those rights when dealing with telemarketers. To reach out to seniors in informal settings, the Commission's has coordinated local events with partners such as the Florida Attorney General's Office, AARP, local BBBs. The FTC's primary focus has been on southern states to reach retired seniors in particular. Since July 1999, the Commission has hosted or participated in seven such events, including an Elder Fraud Conference for consumer advocates, senior leaders and law enforcement in Florida, a consumer awareness forum for minority seniors, and a Consumer University discussing such topics as telemarketing fraud, identify fraud, charity fraud, door-to-door frauds, home repair, mail fraud and Internet fraud.

The Commission's creative and plain English consumer education publications - - most of which are available at the FTC's Web site ftc.gov - - provide advice and tips on a wide range of consumer topics. The publications advise that if a consumer does not wish to

receive subsequent calls from a particular company, the consumer should ask to be placed on the company's "do-not-call" list. The publications further advise that it is an unlawful practice for a telemarketer to call a consumer who has indicated that he or she does not wish to receive calls from the selling organization. The Commission's consumer education materials also inform that the law requires telemarketers to disclose the seller's identity and that the purpose of the call is to sell goods or services. The materials state that consumers should be extremely wary whenever they receive a call from a telemarketer who does not promptly disclose this information. One theme that is stressed in the FTC's consumer education materials is that consumers should hang up on any telemarketer who tells them that they need to send in payment to receive an award or to participate in a prize promotion. The Commission attempts to get the message to consumers that they do not have to pay money to enter a sweepstakes or prize contest. Another important theme is that consumers should never divulge their credit card numbers or checking account numbers over the phone unless they have agreed to make a purchase and they understand the terms of the purchase. The only reason a company ever needs a consumer's credit card or checking account number is to bill the consumer for the purchase. Also, the Commission's consumer education materials note that whenever possible, consumers may wish to make purchases by credit card so that they will have the protections afforded to such transactions by federal law. If the company fails to deliver goods or services paid for by credit card, the consumer is entitled to dispute the charge with the organization that issued his or her credit card, which is obligated to conduct an investigation of the consumer's complaint. Depending upon the result of that investigation, the consumer may be eligible for a credit or refund of the purchase price.

Another important point stressed in the Commission's consumer education materials is that consumers should be on the alert for high-pressure tactics or demands from a telemarketer for an immediate purchasing decision. The materials also advise consumers to consider carefully any offer, to review any written materials, and to seek out advice from family or friends before making an expensive purchase. If consumers are interested in reducing the number of solicitations they receive in the mail or by telephone, they may wish to contact the Direct Marketing Association ("DMA"), a private trade association that voluntarily maintains and supplies to its members lists of consumers who have indicated they do not wish to receive solicitations. Not all direct marketers use the DMA list to screen out consumers. Therefore, contacting DMA will not eliminate the receipt of mail and telephone solicitations, but it may help reduce the volume. The DMA's address is available via the Internet on the Commission's Web site or through the Commission's Consumer Response Center. Consumers can contact the Federal Trade Commission or the state Attorneys General if they lose money to a company engaged in fraud or even if they receive a solicitation which they believe is misleading or suspicious. Although the Commission does not intervene in individual disputes, consumer complaints provide vital information that the Commission uses in developing its enforcement agenda and in determining whether a particular company is engaged in a pattern of deceptive practices or fraud, making it a suitable target for legal action.

**Conclusion**

The Commission's fraud program is of special interest and importance to this country's senior citizens, because the elderly often find themselves victimized by such operations. The Commission will remain alert to new schemes that target senior citizens and will continue its aggressive campaign against telemarketing fraud to prevent injury to all consumers, including the elderly.

1. The views expressed in this statement represent the views of the Commission. However, my oral testimony and responses to questions are my own and do not necessarily reflect the Commission's views or the views of any Commissioner.

2. 15 U.S.C. §§ 41 et seq.

3. E.g., the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq., which mandates disclosures of credit terms; the Fair Credit Billing Act, 15 U.S.C. §§ 1666 et seq., which provides for the correction of billing errors on credit accounts; the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq., which establishes rights with respect to consumer credit reports; the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq., which provides disclosure standards for consumer product warranties; and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-08, which authorizes the Commission to promulgate rules defining and prohibiting deceptive telemarketing practices and other abusive telemarketing practices.

4. E.g., the Telemarketing Sales Rule, 16 C.F.R. Part 310, which defines and prohibits deceptive telemarketing practices and other abusive telemarketing practices; the Care Labeling Rule, 16 C.F.R. Part 423, which requires the provision of care instructions for wearing apparel; the Franchise Rule, 16 C.F.R. Part 436, which requires the provision of information to prospective franchisees; the Mail and Telephone Order Merchandise Rule, 16 C.F.R. Part 435, which gives consumers certain rights when ordering products through the mail; and the Funeral Rule, 16 C.F.R. Part 453, which regulates certain pricing and sales practices by funeral providers.

5. See, Committee on Government Operations, *The Scourge of Telemarketing Fraud: What Can Be Don Against It?*, Fifteenth Report by the Committee on Government Operations (U.S. G.P.O.: 1991), at p. 7 ("Various estimates place losses to consumers each year from telemarketing fraud at $3 billion to $15 billion to $40 billion and probably hundreds of millions of dollars to financial institutions.").

6. Recent survey research conducted on behalf of AARP shows that there is no ready answer explaining why a disproportionate number of telemarketing fraud victims are elderly. The research rebuts the notion that the elderly are vulnerable because they are socially isolated, ill-informed, or confused. The survey shows, however, that older people who fall for telemarketing scams tend to believe the pitches they hear -- that they have a good chance of actually winning the grand prize, and that the products touted are worth the price charged for them. Ninety percent of respondents report awareness of consumer fraud; yet two-thirds said it is hard to spot fraud when it is happening. The survey also shows that elderly victims find it difficult to terminate telephone conversations, even when they say they are not interested in continuing a conversation. They are also reluctant to seek advice or assistance from others about financial matters in general.

7. 15 U.S.C. §§ 53(b) and 57b.

8. Consumer Sentinel is discussed *infra* at p. 14.

9. Project Prize Fighter, announced in July 2000, included 3 FTC actions and 11 criminal actions among the 21 actions brought by the U.S. Postal Inspection Service, Attorneys General from five states, and two local law enforcement authorities. In addition, the eight cases the Commission brought in connection with Operation Jackpot in 1996 resulted in the defendants paying more than $550,000 in consumer redress or

disgorgement to the U.S. Treasury.

10. The Commission examined demographic data on the victims of five telefunding operations the Commission sued in 1994 and found that out of 143 consumers interviewed, 85 percent were at least 65 years of age.

11. See FTC v. North American Charitable Services, Inc., Civil No. SACV 98- 968 LHM (EEx)(C.D. Cal. filed Nov. 9, 1988); FTC v. Eight Point Communications, Inc., Civil No. 98-74855 (E.D. Mich. filed Nov. 10, 1998); FTC v. Leon Saja, d/b/a Southwest Publishing, Civil No. CIV 97-0666 PHX sm (D. Ariz. filed March 31, 1997); FTC v. The Baylis Co., Civil. No. 94-0017-S-LMB (D. Idaho filed Jan. 10, 1994); FTC v. NCH, Inc., Civil No. CV-S-94-00138-LDG (LRL) (D. Nev. filed Feb. 14, 1994); FTC v. International Charity Consultants, Civil No. CV-S-94-00195-DWH (LRL) (D. Nev. filed Mar. 1, 1994); FTC v. United Holdings Group, Inc. (D. Nev. 1994); FTC v. Voices for Freedom, Civil No. 91-1542-A (E.D. Va. filed Oct. 21, 1991).

12. A number of the Commission's cases sought injunctions against the defendants' failure to comply with the Commission's Franchise Rule, 16 C.F.R. Part 436, which requires sellers of franchises and business opportunities to provide prospective purchasers with disclosures covering 20 specified material topics, including the names and addresses of current and former owners of the franchise or business opportunity.

13. In its investigation of one recovery room case, SCAT, Commission staff interviewed 43 consumers who were allegedly victimized or approached by SCAT telemarketers. Of these individuals, 81 percent were at least 65 years of age; 47 percent were at least 75; and 23 percent were at least 80. Similar percentages have been found in other recovery room cases.

14. The Telemarketing Sales Rule expressly prohibits telemarketers from requesting or accepting payment for "recovery" services until 7 business days after the promised goods, services, or cash have been recovered and delivered to the consumer. 16 C.F.R. § 310.4(a)(3).

15. FTC v. Telecommunications Protection Agency, Inc., Civil No. CIV-96-344-5 (E.D. Okla. filed July 24, 1996); FTC v. Desert Financial Group, Inc., Civil No. CV-S-95-0151-LDG (D. Nev. filed Dec. 5, 1995); FTC v. Meridian Capital Corp., Civil No. CV-S-96-00063-PMP (D. Nev., transferred to D. Nev. Jan. 23, 1996, originally filed in D.D.C Aug 17, 1995); FTC v. USM Corp., Civil No. CV-S-95-0668-LDG (D. Nev. filed July 12, 1995); FTC v. PFR, Civil No. CV-S-95- 000745-HDM (D. Nev. filed Jan. 25, 1995); FTC v. Thadow, Inc., Civil No. CV-S-95-00074-PMP (D. Nev. filed Jan. 25, 1995); FTC v. United Consumer Services, Civil No. 1:94-CV-3164-CAM (N.D. Ga. filed Nov. 30, 1994); FTC v. Richard Canicatti, d/b/a Refund Information Services, Civil No. CV-S-No. 94-859-HDM (D. Nev. filed Oct. 11, 1994).

16. The study, summarized in a comment submitted to the Commission that is available at www.ftc.gov/bcp/rulemaking/tsr/comments/index.html, also stated that consumers age 50 and older accounted for 38 percent of their telemarketing fraud complaints across all categories.

17. For a comprehensive overview of the Commission's Internet law enforcement activities, including a list of cases, see *Five Years: Protecting Consumers Online*, available at www.ftc.gov/opa/1999/9912/fiveyearreport.htm.

18. As part of Operation Cure.All, in June 2000, the Commission announced a $1 million settlement with Lane Labs USA, Inc., resolving allegations of false and unsubstantiated claims about the company's shark cartilege and skin cream marketed to consumers as cancer treatments (FTC v. Lane Labs USA, Inc., Civil No. CV-00-3174 (WGB) D. N.J. filed June 28, 2000). Other Cure.All cases include Michael D. Miller, d/b/a Natural Heritage Enterprises, Docket No. C-3941 (May 16, 2000); CMO Distribution Centers of America, Docket No. C-3942 (May 16, 2000); EHP Products, Docket No. C-3940 (May 16, 2000); Arthritis Pain Care Center, Docket No. C-3896 (Sept. 7, 1999); Body Systems Technology, Inc., Docket

No. C-3895 (Sept. 7, 1999).

19. Knowing that many consumers use the Internet to shop for information, agency staff have developed "teaser" sites that mimic the characteristics that make a site fraudulent. Metatags embedded in the FTC sites make them instantly accessible to consumers who are using major search engines and indexing services as they look for products, services, and business opportunities. Within three clicks, the "teaser" sites link back to the FTC's site. There, consumers can find the practical information they need to learn to recognize fraudulent claims. The agency has developed 13 such "teaser" sites on topics ranging from health care products to scholarship services to vacation deals and investments, and feedback from the public has been overwhelmingly positive.

20. In recognition of the FTC's contributions, the U.S. Department of Justice honored the FTC attorneys with its John Marshall Award for inter-agency cooperation in support of litigation in 1996.

21. See 18 U.S.C. § 2236 for enhanced penalties for any telemarketer convicted of victimizing ten or more persons over the age of 55 or targeting persons over the age of 65. The United States Sentencing Guidelines also increase sentences for any convicted criminal that targets victims according to age. See, USSG § 3A1.1.

22. *United States v. Jeffrey Jordan et al.*, CR-S-96-113-LRL (D. Nev. filed 1997; subsequently transferred to D.D.C.).

23. For a description of the case, see "Ex-Regulator Sentenced in Telemarket Fraud," *The New York Times*, July 18, 2000 at C2.

24. The Consumer Sentinel complaint form does not ask for the caller's age. Identity theft callers have the option of providing age information. About 55% of victims calling the identity theft hotline report their age. Of these, 40% fall between the 30 and 44 years of age. Approximately 26% are between age 45 and 64, and another 25% are between age 19 and 29. About 7% of those reporting their ages are 65 and over; and slightly over 2% are age 18 and under.